IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-516

No. COA18-253-2

Filed 2 August 2022

Ashe County, No. 16 CVS 514

ASHE COUNTY, NORTH CAROLINA, Plaintiff,

v.

ASHE COUNTY PLANNING BOARD and APPALACHIAN MATERIALS, LLC, Respondents.

Appeal by Petitioner from order entered on 30 November 2017 by Judge Susan E. Bray in Ashe County Superior Court. Heard in the Court of Appeals on 3 October 2018. *See Ashe Cnty. v. Ashe Cnty. Plan. Bd.*, 265 N.C. App. 384, 829 S.E.2d 224 (2019). Heard in the Supreme Court on 1 September 2020. Remanded to the Court of Appeals by the Supreme Court on 18 December 2020. *See Ashe Cnty. v. Ashe Cnty. Plan. Bd.*, 376 N.C. 1, 852 S.E.2d 69 (2020). Decided on remand by the Court of Appeals without additional hearing.

*Womble Bond Dickinson (US) LLP, by Amy O'Neal and John C. Cooke, for Petitioner-Appellant.*

*Moffatt & Moffatt, PLLC, by Tyler R. Moffatt, for Respondent-Appellee Appalachian Materials, LLC.*

*No brief for Respondent-Appellee Ashe County Planning Board.*

*Law Offices of F. Bryan Brice, Jr., and David E. Sloan, for Blue Ridge Environmental Defense League and Protect Our Fresh Air, amicus curiae.*

*Teague Campbell Dennis & Gorham, LLP, by Natalia K. Isenberg, for the North Carolina Association of County Commissioners, amicus curiae.*

JACKSON, Judge.

¶ 1      A panel of this Court issued an opinion in this case on 21 May 2019, affirming the order of the trial court. *Ashe Cnty. v. Ashe Cnty. Plan. Bd.*, 265 N.C. App. 384, 394, 829 S.E.2d 224, 231 (2019) ("*Ashe Cnty. I*"), *rev'd in part*, 376 N.C. 1, 852 S.E.2d 69 (2020). On 18 December 2020, our Supreme Court reversed in part the prior opinion of this Court, remanding the case to our Court for us to resolve outstanding issues in the appeal in light of the Supreme Court's holding that the primary holding of this Court's prior opinion was erroneous. *Ashe Cnty. v. Ashe Cnty. Plan. Bd.*, 376 N.C. 1, 16, 20-21, 852 S.E.2d 69, 79, 82-83 (2020) ("*Ashe Cnty. II*"). Our Supreme Court's opinion recounts the facts of the case in detail, *id.* at 2-9, 852 S.E.2d at 70-75, so we repeat only those necessary for an understanding of the disposition of the issues that remain.

## I.    Factual and Procedural Background

¶ 2      In 2015, Ashe County had a land use ordinance called the Polluting Industries Development Ordinance ("PID Ordinance"), which had been in effect for 16 years. The PID Ordinance created a permit system administered by the Ashe County Planning Department with numerous requirements, the most relevant of which were

that

> (1)     the applicant pay a $500 uniform permit fee;
>
> (2)     the applicant have obtained all necessary federal and state permits;
>
> (3)     the polluting industry not be located within 1,000 feet of a residential dwelling unit or commercial building; and
>
> (4)     the polluting industry not be located within 1,320 feet of a school, daycare, hospital, or nursing home facility.

*Ashe Cnty. II*, 376 N.C. at 2-3, 852 S.E.2d at 71.

¶ 3          This case is about a permit application submitted under the PID Ordinance that did not meet the second requirement because at the time the application was submitted, the applicant had not yet obtained an air quality permit issued by the North Carolina Department of Environmental Quality ("DEQ") that would have been required for its proposed use of 3.58 acres of land in the County to proceed.

¶ 4          Defendant Appalachian Materials, LLC ("Appalachian Materials") is an asphalt sales and production company that beginning in at least 2015 was interested in operating an asphalt plant in Ashe County.  In early June of 2015, Appalachian Materials submitted an application and $500 permit fee under the PID Ordinance to the County's Planning Director to obtain County approval of the proposed plant. While Appalachian Materials had applied for an air quality permit from DEQ at the time it submitted the PID Ordinance application, the air quality permit application

was still pending. DEQ issued the air quality permit on 26 February 2016, and Appalachian Materials promptly forwarded the air quality permit to the County's Planning Director to supplement the PID Ordinance application it had submitted the previous June.

¶ 5 In the intervening period—between June 2015 when Appalachian Materials submitted its initial, incomplete PID Ordinance permit application and February 2016 when Appalachian Materials supplemented the application with the required air quality permit issued by DEQ—the political winds had shifted against Appalachian Materials in Ashe County. In response to concerned citizens raising questions about the location of the proposed plant, the Ashe County Board of Commissioners (the "County Board") enacted a moratorium prohibiting the issuance of new PID Ordinance permits on 19 October 2015, which was effective until 19 April 2016. In other words, by the time Appalachian Materials supplemented its application because DEQ had finally issued the air quality permit, the moratorium had taken effect, barring issuance of the PID Ordinance permit until at least 19 April 2016.

¶ 6 On 4 April 2016, the moratorium was extended an additional six months. On 3 October 2016, after the moratorium had lifted, the County Board repealed the PID Ordinance and enacted a new ordinance in its place, the High Impact Land Use Ordinance, which created new and more onerous requirements applicable to permits

to operate asphalt plants.

¶ 7        By this point, Appalachian Materials was embroiled in a dispute with the County over when and whether its application for the PID Ordinance permit was complete and whether it had complied with the PID Ordinance and was entitled to issuance of a permit under the less onerous, now-repealed regulatory regime that had governed at the time the initial, incomplete application was submitted and for the previous 16 years.

¶ 8        The Planning Director denied the application on 20 April 2016, giving three reasons for the decision: (1) a complete application was not submitted before the moratorium went into effect on 15 October 2015; (2) the 3.58 acres was within 1,000 feet of two commercial buildings—a quarry and a barn; and (3) the incomplete application submitted by Appalachian Materials on 29 February 2016 contained material misrepresentations. Based on a comparison of the incomplete PID Ordinance application and the air quality permit application submitted to DEQ, the Planning Director concluded that inconsistencies between the applications proved deceptive intent on the part of Appalachian Materials. Specifically, the air quality permit application submitted to DEQ represented that the annual output of the asphalt plant would be 300,000 tons per year or less, whereas the incomplete PID Ordinance application submitted to the County represented that the annual output of the asphalt plant would be 150,000 tons per year or less. Based on the scale of the

output of the proposed plant reflected by the representations in the air quality permit application submitted to DEQ, the Planning Director additionally concluded that Appalachian Materials potentially anticipated using the quarry within 1,000 feet of the proposed plant as part of the operation, which if true, would mean that the proposed plant was within 1,000 feet of *both* commercial buildings *and* residences, neither of which was permitted. Appalachian Materials noted an appeal to the Ashe County Planning Board (the "Planning Board") from the Planning Director's denial.[1]

¶ 9 On appeal to the Planning Board, Appalachian Materials took the position that a 22 June 2015 letter from the Planning Director to Appalachian Materials was a final determination that bound the County to issue the PID Ordinance permit. The letter read as follows:

> I have reviewed the plans you have submitted on behalf of Appalachian Materials LLC for a polluting industries permit. The proposed asphalt plant is located on Glendale School Rd, property identification number 12342-016, with no physical address.
>
> The proposed site does meet[] the requirements of the Ashe County Polluting Industries Ordinance, Chapter 159 (see attached checklist). However, the county ordinance *does require that all state and federal permits be in hand <u>prior to a local permit being issued</u>*. We have on file the general NCDENR Stormwater Permit and also the Mining Permit for this site. *Once we have received the NCDENR Air*

---

[1] A County ordinance authorized the Ashe County Planning Board to act as Ashe County's board of adjustment.

*Quality Permit[,] our local permit can be issued for this site.*

If you have any questions regarding this review[,] please let me know.

(Emphasis added.)

¶ 10    Despite the language emphasized above, Appalachian Materials prevailed in its appeal to the Planning Board, and the Planning Board reversed the Planning Director's decision and ordered that a PID Ordinance permit be issued to Appalachian Materials. The County Board then petitioned to Ashe County Superior Court for judicial review of the Planning Board's decision. In the trial court, Appalachian Materials prevailed again, and the court ordered the County Board to issue the permit within ten days. The County Board then noted an appeal to our Court.

¶ 11    In the appeal to our Court, Appalachian Materials prevailed a third time. *Ashe Cnty. I*, 265 N.C. App. at 394, 829 S.E.2d at 231. This Court's prior opinion, which was unanimous, reasoned that the 22 June 2015 letter was not a final determination but that it nonetheless "did have *some* binding effect[,]" and that Appalachian Materials was prejudiced by the letter because it could have sought a variance were it not for the letter. *Id.* at 392-93, 829 S.E.2d at 229-30 (emphasis in original). The Court essentially held that the County Board was estopped from denying that the 22 June 2015 letter was a final determination because the County Board had not appealed from the issuance of the letter to the Planning Board within 30 days

(presumably from the date the Planning Director dated the letter rather than the date Appalachian Materials received it, although the prior opinion did not address this detail), even though there was no existing procedure for such an appeal at the time. *Id.* at 392-94, 829 S.E.2d at 229-31.

¶ 12          Our Supreme Court was unpersuaded. In a unanimous opinion, the Court held that the 22 June 2015 letter was not "any sort" of a final determination, "in whole or in part," reversing the holding of this Court based on the estoppel theory. *Ashe Cnty. II*, 376 N.C. at 16, 852 S.E.2d at 79. The Supreme Court was more circumspect about the implications of this holding, however, remanding the case to our Court to determine (1) "whether Appalachian Materials' application was sufficiently complete at the time that it was submitted to the Planning Director to trigger the application of the permit choice statutes"; (2) "whether the Planning Director was authorized to deny Appalachian Materials' permit application on the basis of the moratorium statute"; (3) "whether the proposed asphalt plant was located within 1,000 feet of a commercial building"; and (4) "whether the Planning Board erred by rejecting the Planning Director's determination that Appalachian Materials' application contained material misrepresentations." *Id.* at 20, 852 S.E.2d at 82.

¶ 13          Striking a deferential tone, the Supreme Court first noted this Court's prior reliance on the 22 June 2015 letter to resolve nearly the entirety of the substance of the appeal and second, "the fact that all of the[] additional issues appear[ed] to . . . be

. . . interrelated with the appeal-related issue . . . resolved" by its opinion, concluding that "the Court of Appeals should revisit each of these additional issues and decide them anew without reference to the fact that Ashe County did not appeal the 22 June 2015 letter." *Id.* at 21, 852 S.E.2d at 82. "Although the 22 June 2015 letter did not constitute a final decision triggering the necessity for an appeal," the Court added, "we do not hold that that letter is irrelevant to the making of the necessary determinations on remand, with the parties remaining free to argue any legal significance that the letter may or may not, in their view, have." *Id.* Accordingly, the Court remanded the case to our Court "for reconsideration of each of the[] additional issues[.]" *Id.*

## II.    Standard of Review

¶ 14        On appeal from the decision of the Planning Board, a body authorized by a local ordinance to act as the County's board of adjustment, the trial court sat as an appellate court, reviewing the Planning Board's decision on a writ of certiorari. *See Dellinger v. Lincoln Cnty.*, 248 N.C. App. 317, 322, 789 S.E.2d 21, 26 (2016). At the time of the Planning Board's decision and the proceeding in Superior Court, former N.C. Gen. Stat. § 160A-388 provided that "[e]very quasi-judicial decision shall be subject to review by the superior court by proceedings in the nature of certiorari pursuant to G.S. 160A-393." N.C. Gen. Stat. § 160A-388(e2)(2) (2019) (repealed by 2019 S.L. 111 § 2.3) (recodified at N.C. Gen. Stat. § 160D-406(k) (2021)).

The Superior Court's functions when reviewing the decision of a board sitting as a quasi-judicial body include:

(1)     Reviewing the record for errors in law,

(2)     [E]nsuring that procedures specified by law in both statute and ordinance are followed,

(3)     [E]nsuring that appropriate due process rights of a petitioner are protected including the right to offer evidence, cross-examine witnesses, and inspect documents,

(4)     [E]nsuring that decisions of [the Planning Board] are supported by competent, material and substantial evidence in the whole record, and

(5)     [E]nsuring that decisions are not arbitrary and capricious.

. . .

When [an] assignment of error alleges an error of law, *de novo* review is appropriate.  Under a *de novo* standard of review, a reviewing court considers the case anew and may freely substitute its own interpretation of an ordinance[.]

*Thompson v. Union Cnty.*, 2022-NCCOA-382 ¶ 10-11.

### III.     Analysis

We review each of the outstanding issues in the order they are listed in our

Supreme Court's opinion.

### A. The Permit Choice Statutes Do Not Apply Because the Application Was Not Submitted Until After the Moratorium Went into Effect

Based on our Supreme Court's holding that the 22 June 2015 letter was not

"any sort" of a final determination, *Ashe Cnty. II*, 376 N.C. at 16, 852 S.E.2d at 79,

we hold that the application was complete on 29 February 2016—when Appalachian Materials forwarded the air quality permit issued by DEQ to the Planning Director and demanded that the PID Ordinance permit be issued. In June 2015, Appalachian Materials had not "obtained all necessary federal and state permits[,]" *id.* at 2, 852 S.E.2d at 71, as was required, because DEQ had not issued the air quality permit until 26 February 2016, and this "necessary . . . state permit" was not submitted to the Planning Director by counsel for Appalachian Materials until three days later, on 29 February 2016. As the 22 June 2015 letter from the Planning Director noted, "the county ordinance [] require[d] that all state and federal permits be in hand *prior to a local permit being issued.*" (Emphasis added.) Only after Appalachian Materials supplemented its application with the required air quality permit on 29 February 2016 could the "local [PID Ordinance] permit [] be issued for th[e] site[,]" to quote the 22 June 2015 letter again. However, by that time, the County Board had adopted a moratorium prohibiting the issuance of new PID Ordinance permits.

¶ 17        The permit choice statutes—N.C. Gen. Stat. §§ 143-755, 153A-320.1, and 160A-360.1 on 29 February 2016 and N.C. Gen. Stat. §§ 143-755 and 160D-108 today—provide, in general, that if a land use regulation changes between the time a permit application is "submitted" and the time a permit decision is made, then the applicant

may choose which version of the regulation applies.[2]  N.C. Gen. Stat. § 143-755(a) (2021).  The purpose of these provisions is to protect the investment and reasonable reliance of developers on the decisions of local government regarding "site evaluation, planning, development costs, consultant fees, and related expenses."  *Id.* § 160D-108(a).  Our General Assembly has found that they "strike an appropriate balance between private expectations and the public interest" by "provid[ing] for the establishment of certain vested rights in order to ensure reasonable certainty, stability, and fairness in the development regulation process, to secure the reasonable expectations of landowners, and to foster cooperation between the public and private sectors in land-use planning and development regulation."  *Id.*

¶ 18          However, application of the permit choice statutes to the PID Ordinance application submitted by Appalachian Materials depends on the "permit application [being] submitted" where "a rule or ordinance changes between the time a permit

---

[2] In 2019, the General Assembly enacted "An Act to Clarify, Consolidate, and Reorganize the Land-Use Regulatory Laws of the State[,]" repealing N.C. Gen. Stat. §§ 150A-320 to 153A-326. 2019 S.L. 111 § 2.2. Session Law 2019-111 consolidated and reorganized the municipal and county land-use planning and development statutes into one Chapter of the General Statutes. *Id.* § 2.1(e). It also made various changes and clarifying amendments, *id.* § 1.1, *et seq.*, and gave persons aggrieved a separate cause of action, distinct from the certiorari statute, which it amended significantly, *id.* §§ 1.7, 1.9 (codified at N.C. Gen. Stat. §§ 160A-393.1, -393).  In 2020, the General Assembly enacted Session Law 2020-25, completing the consolidation of the land use statutes into one Chapter of the General Statutes, as directed by Session Law 2019-111.  *An Act to Complete the Consolidation of Land-use Provisions into One Chapter of the General Statutes as Directed by S.L. 2019-111, as Recommended by the General Statutes Commission*, 2020 S.L. 25.

application is submitted and a permit decision is made[.]" N.C. Gen. Stat. § 153A-320.1(a) (2016) (repealed 2020). That is, application of the statutes depends on when the PID Ordinance application was "submitted," and the statutes do not apply unless an application has been submitted *before* the land use regulation changes.

¶ 19 We hold that the PID Ordinance permit application submitted by Appalachian Materials was not "submitted" within the meaning of the permit choice statutes until it was complete—on 29 February 2016, when counsel for Appalachian Materials forwarded the air quality permit issued by DEQ on 26 February 2016 to the Planning Director and demanded that the PID Ordinance permit be issued—because only then did the application meet the requirements that "(1) the applicant pay a $500 uniform permit fee; [and] (2) the applicant have obtained all necessary federal and state permits[.]" *Ashe Cnty. II*, 376 N.C. at 2, 852 S.E.2d at 71. Yet, on 29 February 2016, when the application was complete, the relevant land use regulation—the PID Ordinance—had not yet been repealed and replaced by the High Impact Land Use Ordinance, which did not occur until 3 October 2016. Instead, the County Board had adopted a moratorium on the issuance of any new permits under the PID Ordinance. Whether the Planning Director was justified in denying the application on 20 April 2016 that was submitted within the meaning of the permit choice statutes by Appalachian Materials the previous February thus depends on whether the moratorium adopted by the County Board on 19 October 2015 and later extended

until 3 October 2016 barred the Planning Director from issuing the permit.

**B. The Moratorium Statute Did Not Authorize the Planning Director to Approve the Application**

¶ 20      The moratorium statute in effect in February 2016, when Appalachian Materials submitted a complete PID Ordinance application, authorized counties to adopt development moratoria under certain conditions, but exempted from the applicability of these moratoria "development for which substantial expenditures ha[d] already been made in good faith reliance on a *prior* valid administrative or quasi-judicial permit or approval[.]"  N.C. Gen. Stat. § 153A-340(h) (2016) (repealed 2020) (emphasis added).   The moratorium statute in effect today preserves the exemption contained in former-§ 153A-340(h) from the applicability of these moratoria to "development for which substantial expenditures have already been made in good-faith reliance on a *prior* valid development approval[.]"  N.C. Gen. Stat. § 160D-107(c) (2021) (emphasis added).  Eliminating any ambiguity about whether the permit choice statutes apply to a permit application that has been submitted but not yet approved before a moratorium goes into effect that prohibits the requested land use, the current moratorium statute goes on to specify that "if a <u>*complete*</u> application for a development approval has been *submitted* prior to the effective date of a moratorium, G.S. 160D-108(b) [i.e., the permit choice rule] applies when permit processing resumes."  *Id.* (emphasis added).

¶ 21     In other words, under former-§ 153A-340(h) only "permitted" or "approved" land uses were exempt from the moratorium statute in effect in February 2016—an exemption former-§ 153A-340(h)'s successor statute, § 160D-107(c), both preserves and clarifies in relation to the permit choice statutes, by cross-referencing one of the permit choice statutes in effect today and specifically providing that the permit choice rule applies only to "*complete*[*d*] application[s] for . . . approval[.]"  *Id.* § 160D-107(c) (emphasis added).  *See also Town of Hazelwood v. Town of Waynesville*, 320 N.C. 89, 95, 357 S.E.2d 686, 689 (1987) ("When the legislature amends an ambiguous statute, the presumption is not that its intent was to change the original act, but merely to clarify that which was previously doubtful." (internal marks and citation omitted)).

¶ 22     We therefore hold that the application by Appalachian Materials submitted within the meaning of the permit choice statutes in February 2016 was not exempt from the moratorium adopted by the County Board on 19 October 2015 because Appalachian Materials never obtained "a *prior* valid administrative or quasi-judicial *permit*" or "*approval*" of the application.  *See, e.g.*, *Ashe Cnty. II*, 376 N.C. at 19, 852 S.E.2d at 81 ("[*N*]*o part* of the 22 June 2015 letter constituted a final, binding decision[.]" (emphasis in original)).  Indeed, Appalachian Materials could not have obtained a permit or approval of the application by October 2015 when the application was not even submitted until four months later, after the outstanding air quality permit was submitted, which completed the application.  *See* N.C. Gen. Stat. § 153A-

320.1 (2016) ("*If* a rule or ordinance changes between the time a permit application is *submitted* and a permit decision is made, *then* G.S. 143-755 shall apply.") (emphasis added); N.C. Gen. Stat. § 143-755(a) (2021) ("If a development permit applicant submits a permit application for any type of development and a rule or ordinance is amended, . . . between the time the development permit application was submitted and a development permit decision is made, the development permit applicant may choose which adopted version of the rule or ordinance will apply[.]"). *See also id.* § 160D-107(c) ("Notwithstanding the foregoing, if a *complete* application for a development approval has been *submitted prior* to the effective date of a moratorium, G.S. 160D-108(b) applies when permit processing resumes.") (emphasis added); *id.* § 160D-108(b) ("If a land development regulation is amended between the time a development permit application was submitted and a development permit decision is made or if a land development regulation is amended after a development permit decision has been challenged and found to be wrongfully denied or illegal, G.S. 143-755 applies.").

¶ 23        North Carolina General Statute § 153A-340(h) authorized Ashe County, through the County Board, N.C. Gen. Stat. § 153A-340(c1) (2016) (repealed 2020), to "adopt temporary moratoria on any county development approval required by law[,]" with exceptions not applicable here, *id.* § 153A-340(h), and in the absence of any exemption provided by the moratorium statute in effect in February 2016, we hold

that under the moratorium approved by the County Board in October 2015, the Planning Director lacked the authority to approve the application.[3]

**C. The Proposed Asphalt Plant Was Located within 1,000 Feet of a Commercial Building**

¶ 24     As noted above, the Planning Director concluded in the 20 April 2016 denial of the incomplete PID Ordinance application submitted by Appalachian Materials that the 3.58 acres leased by Appalachian Materials for the proposed plant was within 1,000 feet of two commercial buildings—a quarry and a barn—and it was a requirement of the PID Ordinance in effect in February 2016 that permitted polluting industries "*not be* located within 1,000 feet of a residential dwelling unit or commercial building[.]" *Ashe Cnty. II*, 376 N.C. at 2, 852 S.E.2d at 71 (emphasis added). We hold that the record supports the Planning Director's conclusions regarding the location of these commercial buildings, and that the buildings did, in fact, qualify as commercial buildings within the meaning of the PID Ordinance in February 2016. Although any mention of the quarry is conspicuously absent from this Court's prior opinion, even the prior opinion conceded that the evidence was "uncontradicted . . . that the barn was owned by a neighbor who ran a business in

---

[3] The Planning Director could have held the application in abeyance until the moratorium lifted. Because we hold that Appalachian Materials was not entitled to the benefit of the permit choice statutes based on the time the application was submitted, after the PID Ordinance was repealed, the Planning Director would no longer have had the authority to do anything but deny the application.

which he harvested and sold hay and that he used the barn to store his hay inventory and to store farm equipment used to harvest hay." *Ashe Cnty. I*, 265 N.C. App. at 393, 829 S.E.2d at 230.

¶ 25    Our Supreme Court's reversal of the holding in this Court's prior opinion that the County was estopped from later denying anything the 22 June 2015 letter said repudiates the reasoning in this Court's prior opinion that it was unnecessary to resolve whether the buildings identified in the 20 April 2016 denial qualified as commercial buildings. *See, e.g.*, *Ashe Cnty. I*, 265 N.C. App. at 393, 829 S.E.2d at 230 ("[T]he Planning Director made the determination that they were *not* commercial buildings in his June 2015 Letter and [] his determination was binding on the County.") (emphasis in original). Based on our Supreme Court's holding that the 22 June 2015 letter was not "any sort" of a final determination, "in whole or in part," *Ashe Cnty. II*, 376 N.C. at 16, 852 S.E.2d at 79, we hold that denial of the application by the Planning Director was required because the proposed plant would have been located within 1,000 feet of not one, but two commercial buildings—a quarry and a barn, *see Ashe Cnty. I*, 265 N.C. App. at 393, 829 S.E.2d at 230 (noting the definition of "business" in a County ordinance as a "commercial trade . . . including but not limited to . . . agricultural . . . and other similar trades or operations").

## D. Alleged Material Misrepresentations in the Application Submitted by Appalachian Materials

¶ 26    Because there were two independently sufficient reasons in February 2016 preventing the Planning Director from granting the permit application submitted by Appalachian Materials—a complete version of the application was not submitted until 29 February 2016, after the 15 October 2015 moratorium went into effect, and there were two commercial buildings within 1,000 feet of the 3.58 acres leased by Appalachian Materials where the proposed plant was to be located—we do not reach the issue of whether the alleged material misrepresentations in the PID Ordinance application were, in fact, misrepresentations, and if so, whether they constituted an independent basis for denying the PID Ordinance application submitted by Appalachian Materials.

¶ 27    In general, "we do not make credibility assessments as an appellate court." *State v. Daw*, 277 N.C. App. 240, 268-69, 2021-NCCOA-180 (citation omitted). The reason is that trial courts, unlike our Court, have "the opportunity to see the parties; to hear the witnesses; and to detect tenors, tones, and flavors that are lost in the bare printed record read months later by appellate judges[.]" *Shipman v. Shipman*, 357 N.C. 471, 474, 586 S.E.2d 250, 253 (2003) (cleaned up).

¶ 28    Nevertheless, we note that the inconsistency between the representation in the incomplete PID Ordinance application and the air quality permit application submitted to DEQ regarding the anticipated output of the proposed plant supports the inference of deceptive intent drawn by the Planning Director:  Appalachian

Materials obtained an air quality permit from DEQ representing to DEQ that it anticipated operating an asphalt plant in Ashe County producing as much as twice as much asphalt annually as it had represented that it planned to produce to local officials in Ashe County in its PID Ordinance application. On the cold record, it is impossible to determine whether the representation in the PID Ordinance application is false, the representation in the air quality permit application is false, or whether any false representation in the PID Ordinance application was made knowingly. Yet, the representations could not both be true at the time a complete PID Ordinance application was submitted in February of 2016.

## IV. Conclusion

We reverse the order of the trial court requiring Ashe County to issue Appalachian Materials a PID Ordinance permit.

REVERSED.

Chief Judge STROUD concurs.

Judge DILLON dissents by separate opinion.

DILLON, Judge, dissenting.

I vote to affirm Judge Bray's order, affirming the Planning Board's decision to direct the issuance of the permit to Appalachian Materials ("AM").

I conclude AM is entitled to have its permit application considered under the more developer-friendly version of the County's ordinance in place when AM's application was submitted in June 2015. The fact that AM's application filed with the State for the required air quality permit was pending does not render AM ineligible for protection under our permit choice law.

I further conclude the Planning Board's findings support its conclusion that the barn and quarry located within 1000 feet from AM's proposed operation were not "commercial buildings" under the County ordinance which prohibits the location of asphalt plants within 1000 feet of a commercial building.

Finally, I conclude the Planning Board's findings support its conclusion that AM's permit application should not be denied based on alleged material misrepresentations made by AM in its application.

Accordingly, I respectfully dissent.

## I. Background

This matter concerns AM's desire to operate an asphalt plant on land it owns in Ashe County. To have the legal right to do so, AM is required to obtain a permit from the County as well as an air quality permit from the State.

¶ 36        In June 2015, AM filed its application with Ashe County for the County permit along with the required application fee.  At the same time, AM filed its application with the State for the required air quality permit.  Shortly after the County application was filed, the County's Planning Director sent a letter to AM stating that AM's proposal appeared to meet the County's Code requirements but that the County permit could not be issued until the State permit was issued.

¶ 37        Four months later, in October 2015, due to political pressure from the some of the County's citizenry regarding AM's proposed plant, the County's elected Board enacted a temporary moratorium on asphalt plant permits.

¶ 38        In February 2016, four months into the moratorium, AM obtained and forwarded the required air quality permit from the State.

¶ 39        But two months later, in April 2016, while the moratorium was still in place, the County's Planning Director denied AM's permit application.  The Planning Director articulated three separate reasons for its denial, discussed herein.  AM appealed that decision to the County Planning Board, an *unelected* board which essentially serves as a board of adjustments for Ashe County.

¶ 40        In October 2016, while AM's appeal was pending before the Planning Board, the County's *elected* Board of Commissioners lifted the moratorium but enacted a new ordinance under which AM proposed would not qualify for approval.

¶ 41    In December 2016, the County's Planning Board issued its order, reversing the Planning Director's denial and directing the permit be issued. The County's Board of Commissioners, though, disagreeing with the decision of the Planning Board, appealed the Planning Board's decision to superior court.

¶ 42    In November 2017, Superior Court Judge Bray affirmed the Planning Board's decision to direct the permit be issued.

¶ 43    In May 2019, we affirmed as well, but on a narrow legal ground. We held that the County was bound by the June 2015 statements of its Planning Director that AM's proposal met the requirements under the County ordinance.

¶ 44    However, in September 2020, our Supreme Court issued an opinion disagreeing with our conclusion regarding the binding effect of the Planning Director's initial impressions of AM's application. That Court held that the communications were not binding and remanded the matter for us to consider the other issues raised on appeal.

¶ 45    In this present appeal, the majority concludes the County's Planning Board's decision directing the permit be issued was incorrect and the Planning Director's denial should be reinstated. The majority so concludes based on two of the three independent reasons that were articulated by the Planning Director in his denial letter to AM. The majority takes no position on the third reason. My vote is to affirm Judge Bray and the Planning Board, for the reasoning below.

II.  Discussion

A.  Permit Choice Law

¶ 46    The majority concludes the Planning Director correctly determined that AM was not entitled to have its application considered under the version of the County's ordinance in place in June 2015, when AM submitted its application and paid its fee, reasoning that AM's application was not complete without the State air quality permit in hand.  I disagree with the majority's reading of our permit choice law.

¶ 47    The permit choice law was first enacted by our General Assembly in 2014 and is found in Section 143-755 (entitled "Permit choice") and is cross-referenced in Section 160D-108 (entitled "Permit choice and vested rights") of our General Statutes. Our General Assembly enacted this law to provide that *if* a local government changes its development ordinance between the time a developer applies for a permit and the time a decision is made on that permit application, *then* the developer can choose to have its application decided under the ordinance in place at the time the "applicant submits [its] permit application."  N.C. Gen. Stat § 143-755(a) (2015).  The General Assembly enacted Section 160D-108 in 2019, recognizing that developers have certain "vested rights" under the common law and by statute at some point in the development process, typically after a permit is issued, which cannot be taken away. The right to have one's application considered under existing law may not be a "vested right" under Section 160D-108.  But when it enacted Section 160D-108, our General

Assembly reiterated in Section 160D-108 that this statutory right of an applicant was still in place, reiterating that "G.S. 143-755 applies" where "development regulation is amended between the time a development permit application was submitted and [the] decision is made[.]" N.C. Gen. Stat. § 160D-108(b).

¶ 48 The development of land is typically a long process. Our "General Assembly recognizes the reality that local government approval of development typically follows significant investment by the developer in site evaluation, planning, development costs, consultant fees, and related expenses." N.C. Gen. Stat. § 160D-108(a). Clearly, the elected board in a county has discretion to amend its development regulations for what it believes to be in the public good or in its political interest. Our General Assembly enacted the permit choice laws to "strike a balance" between these realities: A local government should be allowed to amend its ordinances, while at some point of the development process, a developer should have certainty as to the ordinance by which its application will be evaluated. Our General Assembly has defined this point as being the time when the developer "submits a permit application" with the local government. N.C. Gen. Stat. § 143-755.

¶ 49 The phrase "submits a permit application" in Section 143-755 is not defined, nor is there case law construing its meaning.

¶ 50 The majority holds that AM's application was not "submitted" until AM provided proof the State had *approved* the air quality permit, which occurred eight

months after AM applied for the County permit: It was not enough that the air quality permit had been submitted and was pending with the State. I disagree for several reasons.

¶ 51     First, there is nothing in Ashe County's 2015 ordinance to suggest that a developer have all required State and Federal permits in hand before it could submit its application for the required County permit. Rather, the ordinance merely requires that an application not be submitted without payment of the required application fee. The ordinance otherwise merely stated that any required State and Federal permits be in hand before the County would *issue* the permit:

> A permit is required from the Planning Department for any polluting industry. A uniform permit fee of $500.00 shall be paid *at the time of the application* for the permit. No permit from the planning department *shall be issued* until the appropriate Federal and State permits have been issued.

Code of Ashe County, § 159.06(A) (2015) (entitled "Permitting Standards"). This language does not even hint that AM's application could not be submitted (allowing the County to begin its due diligence processing the permit) until after the State permit was in hand. The language merely suggests that the County will not *issue* the permit, even if the County is satisfied that the County requirements are met, until the State permit was in hand. To be sure, back and forth between a county and a developer is common during the county's due diligence approval process. But the fact

that a county may ask for additional information during its due diligence does not render the application *not* submitted. And in this case, the record shows that Ashe County accepted and deposited the fee and began its due diligence review.

¶ 52      Second, the language used by our General Assembly in the permit choice laws supports my conclusion that an application may be deemed "submitted" while the State is conducting its due diligence on the required State permit. For example, the permit choice law provides that applications for which the county seeks additional information will generally be reviewed under the version of the ordinance in place when the "incomplete" application was submitted, so long as the applicant is responsive regarding the shortcomings of its application:

> If . . . the applicant fails to respond to comments or provide additional information reasonably requested by the [county] for a period of six consecutive months or more, the application review is discontinued and the development regulations in effect at the time permit processing is resumed apply to the application.

N.C. Gen. Stat. § 143-755(b1)[4]. Also, the "Moratoria" law enacted in conjunction with Section 160D-108 provides that any proposed development "for which a special

---

[4] Subsection (b1) was not added to Section 143-755 until 2019. However, the session law adding that subsection provides that the subsection "clarify[ies] and restate[s] the intent of existing law and appl[ies] to ordinances adopted before, on, and after the effective date." 2019 Session.Law 155, § 3.1.

The County does not argue that the subsection applies based on the State's *eight* month delay in issuing the air quality permit. If such argument had been made and I had

use permit application *has been accepted as complete*" is generally exempt from any intervening, temporary, permit-issuing moratorium that is adopted. N.C. Gen. Stat. § 160D-107(c) (emphasis added). This "has been accepted as complete" language, however, is not in Section 143-755. Had our General Assembly intended that an application "be accepted as complete" before the permit choice law in Section 143-755 be triggered, that body could have so stated. However, the permit choice law merely requires that the application be "submitted."

¶ 53        Finally, I believe that the majority's interpretation is not in harmony with our General Assembly's intent to provide a sense of certainty for the developer in the process. Many developments require permits from more than one level of government. For instance, a development which involves removing an underground storage tank and stabilizing a stream bank might require – in addition to a development permit from the county where the project is located – a permit from the U.S. Army Corps of Engineers (to stabilize the stream) and a permit from our State's Department of Environmental Quality (to remove the storage tank). The majority's interpretation creates an imbalance between the competing interests. For example, assume an ordinance allows for asphalt plants located more than 1000 feet from a

---

concluded that the subsection applied, my vote would have been to remand for the Planning Board to make findings concerning whether the County was reasonable to require the State permit be provided within six months.

school. The county could thwart any attempt by a developer who must spend significant funds prior to seeking the county permit, simply by changing the distance requirement while the developer awaits its air quality permit from the State.

¶ 54 In sum, I do not think the phrase "submits a permit application" should be read in such an anti-development way as, I believe, the majority is reading it. Of course, it should not be read in a pro-development way. Rather, we should read it in a way that achieves the balance intended by our General Assembly. Perhaps an application left almost entirely blank should not be considered "submitted." But where an applicant has filled out the required application (often after much time and expense) sufficient for the county to evaluate the proposal and has paid its application fee, I believe the application is "submitted." The fact that a county might have follow up questions or requests for additional information does not change this result. Such applicant, at this stage, is entitled to the certainty afforded by our General Assembly.

## B. Commercial Buildings

¶ 55 I disagree with the majority's holding that the nearby barn and the quarry constitute "commercial buildings" under Ashe County's ordinance.

¶ 56 The Planning Board reversed the Planning Director's determination regarding the character of these buildings. Under the Ashe County Code, the Planning Board conducts a *de novo* review of the Planning Director's findings. Specifically, the Code provides that the Planning Board has the authority to "uphold, modify, or overrule[]

in part or in its entirety" any determination made by the Planning Director. Ashe County Code § 153.04(f) (2015). Any finding made by the Planning Board is binding in our review if supported by the evidence in the record.

¶ 57  The term "commercial building" is not defined in the Ashe County Code.

¶ 58  Our Supreme Court instructs that "[t]he basic rule [when construing an ordinance] is to ascertain and effectuate the intention of the municipal legislative body." *Westminster Homes v. Town of Cary Bd. of Adj.*, 354 N.C. 298, 303-04, 554 S.E.2d 634, 638 (2001). The Court further instructs that "[i]ntent is determined according to the same general rules governing statutory construction, that is, by examining (i) language, (ii) spirit, and (iii) goal of the ordinance." *Id.* at 304, 554 S.E.2d at 638. At the same time, the Court "has long held that governmental restrictions on the use of land are construed strictly in favor of the free use of real property." *Morris v. City of Bessemer*, 365 N.C. 152, 157, 712 S.E.2d 868, 871 (2011).

¶ 59  The two buildings at issue here are a quarry shed and a barn.

¶ 60  The quarry is owned by AM's parent. The quarry, itself, is obviously not a "building"; however, AM's parent does maintain a mobile shed as part of the quarry operation. The Planning Board, though, found that AM's parent would have moved the shed if that shed was deemed a "commercial building" and, on that basis, disagreed that the permit should have been denied because of the shed. Alternatively, the Planning Board concluded that the shed was not a "building",

finding that the shed, "lacks a foundation, has no footers, and does not have running water." These findings are supported by the evidence. I agree with the Planning Board's interpretation that a movable shed not attached to the land should not be construed as a "building" within the meaning of the Code. In sum, I agree with both alternative reasons of the Planning Board regarding the shed.

¶ 61        The barn presents a closer question. The Planning Board concluded that the barn was not a "commercial building" based on its findings that "[t]he barn is not used to conduct business, is not used in connection with any commercial activity, has no parking or other access for anyone other than the property owner, has no road access, and does not have electricity or air conditioning" and that the "primary aim" for the barn's owners is not for "financial profit." These findings are all supported by the affidavit of the barn's owners (husband and wife).

¶ 62        The Planning Board also found that the County does not list the barn as a commercial building on the property tax card and that the barn is not located within a commercial district.

¶ 63        The owners, however, do state that they use their property for farming (where they also live) and that they do store farm equipment and materials in the barn.

¶ 64        The question then is whether the storing of farm equipment is enough to render the barn a "commercial building" in the context of a use restriction in an ordinance.

¶ 65        The "language" used in the ordinance is the term "commercial building," a term which is not defined. This term could be read broadly to include even a small shed where a teenager might store his lawn mower used sometimes to mow the lawns of neighbors for money. Or the term could be read narrowly to include only those buildings where commerce takes place.

¶ 66        The "spirit" and the "goal" of the Code are not served by construing "commercial building" to include the barn at issue here. For instance, the purpose of the ordinance as stated in the Code is to protect the "health, safety and general welfare" of those in "established residential and commercial areas in Ashe County." Ashe County Code, § 159.02 (2015). Further, the Code describes a "polluting industry" as "an industry which produces objectionable levels of noise, odors, [etc.] that may have an adverse effect on the health, safety or general welfare of the citizens of Ashe County." Ashe County Code, § 159.05. As no one works in the barn. No customers visit the barn. Nothing is stored there that is sold. The barn is not located in an established commercial area.

¶ 67        In sum, the language, spirit, and goal of the ordinance suggests that the barn is not a "commercial building" within the meaning of the ordinance. Alternatively, the term is, at best, ambiguous. There is a reasonable interpretation which would suggest that the barn is a commercial building, in that it stores equipment that is used, at least in part, in the owners' farming business. However, there is a reasonable

interpretation which would suggest that the barn is not a commercial building, because it is an agricultural building where no commerce takes place. And based on our Supreme Court's jurisprudence, we must construe this ambiguity in favor of AM. I, therefore, conclude that the Planning Board, based on its findings, got it right concerning the barn.

## C. Material Misrepresentation

¶ 68        The Planning Board found that AM did not make any material misrepresentations to the County in its application. The majority does not address this basis offered by the Planning Director when he denied AM the permit. The Planning Board made detail findings to support its ultimate finding on this issue. Given the Planning Board's discretion to substitute its judgment for that of the Planning Director, there is no basis for our Court to reverse the Board's determination on this issue.

## III.    Conclusion

¶ 69        I agree with the Planning Board's resolution on the issues of law which are before us. And I conclude that the Board's findings support its conclusions and the evidence supports those findings. Accordingly, my vote is to affirm Judge Bray's order.